**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CECIL O'NEAL and APRIL O'NEAL, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 06-CV-184-TCK-PJC |
| ) | |
| FIDELITY AND GUARANTY ) | |
| INSURANCE COMPANY, a foreign ) | |
| corporation, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Before the Court is the Motion for Summary Judgment of Defendant Fidelity and Guaranty Insurance Company ("Defendant") (Doc. 16). For the reasons set forth below, the motion is granted, and Defendant is granted judgment on all claims.

**I.     Background**

    **A.     Facts**

Plaintiff Cecil O'Neal ("O'Neal") and his co-worker Terry Chandler ("Chandler"), Arkansas residents, were employed by Garver Engineers ("Garver"), an Arkansas corporation. In early 2004, Chandler drove himself and O'Neal from Arkansas to Oklahoma in a Ford F-150 pick-up truck (the "Insured Vehicle") to complete a surveying job in Tulsa. The Insured Vehicle was owned and insured by Garver. On January 14, 2004, Chandler drove himself and O'Neal in the Insured Vehicle from their hotel to their job site, which was a residential street in Tulsa. While O'Neal was outside the Insured Vehicle performing surveying work, O'Neal was struck by a vehicle operated by former Defendant Shira

1

LaPorte ("LaPorte").[1]  LaPorte was without adequate liability insurance to compensate O'Neal for his injuries.

O'Neal submitted a claim to Defendant for uninsured motorist ("UM") benefits pursuant to an insurance policy (the "Policy") issued by Defendant to Garver.  Garver is the "Named Insured" on the Policy.  Defendant denied the claim on grounds that O'Neal did not meet the definition of an "insured" under the relevant section of the Policy.  In this lawsuit, O'Neal asserts claims against Defendant for breach of the Policy and breach of its obligation of good faith and fair dealing.  Plaintiff April O'Neal, O'Neal's wife, asserts claims for loss of consortium.

### B.      Arguments

In its opening motion, Defendant argued that O'Neal did not qualify as an "insured" because he was not "occupying" the Insured Vehicle at the time of the accident.  This argument is based on the following language in an endorsement to the Policy:

> B.      Who Is An Insured
> If the Named Insured is designated in the declaration as:
> . . .
> 2.      A partnership, limited liability company, *corporation* or any other form of organization, then the following are "insureds":
>    a.      *Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto". . . .*
> . . .
> F.      Additional Definitions
> . . .
> 2.      "Occupying" means in, upon, getting in, on, out or off.

---

[1] LaPorte was originally a Defendant in this lawsuit but was dismissed by stipulation on August 16, 2006.

(*Id.* at 00089-92. (emphasis added).)[2]  Relying on Arkansas case law interpreting the term "occupying" in insurance contracts, Defendant argued that O'Neal did not meet the definition because he was outside the Insured Vehicle.  In their response, Plaintiffs concede that O'Neal was not "occupying" the Insured Vehicle and that O'Neal is not entitled to coverage based on the Policy language.  Plaintiffs argue instead that O'Neal is covered by the Policy by operation of Arkansas law because he was "using" the Insured Vehicle at the time of the accident.  Plaintiffs rely on the Arkansas Supreme Court's decision in *First Security Bank of Searcy v. Doe*s, 760 S.W.2d 863, 864 (Ark. 1988) (hereinafter "*Searcy*"), which holds that Arkansas' UM statute "requires that a company issuing liability insurance on a vehicle must also issue uninsured motorist coverage to one using the insured vehicle," notwithstanding language in an insurance policy attempting to limit UM coverage to those "occupying" the vehicle.[3]  In its reply, Defendant observes that Plaintiffs conceded that O'Neal is not covered by Policy language.  Defendant then argues, also relying on the *Searcy* decision, that O'Neal was not "using" the Insured Vehicle.  Based on the parties' arguments, the sole issue remaining for determination is whether O'Neal was "using" the Insured Vehicle at the time of the accident.

---

[2] The quoted language is contained in an endorsement entitled "Oklahoma Uninsured Motorists Coverage." The parties agree that this section of the Policy governs coverage, and this is the only section of the Policy in the record before the Court.

[3] In *Searcy*, the Arkansas Supreme Court reasoned that "a statute governing insurance coverage becomes part of the policy affected by it." *Id.*  Therefore, because the policy at issue "undoubtedly covered liability resulting from the use of the vehicle by [an employee]," the Arkansas UM statute "expressed the intent of the general assembly to include in uninsured motorist coverage the persons included in liability coverage." *Id.* Although the entire Policy is not part of the record, Defendant does not dispute that the Policy "covers liability arising from use" of the Insured Vehicle, such that those deemed "users" of the Insured Vehicle are entitled to UM coverage.

3

### C.    Choice of Law

A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state. *See Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211 (10th Cir. 2001). Under Oklahoma choice of law principles, Arkansas law applies to the issues presented because the insurance contract being interpreted by the Court was entered and performed in Arkansas. *See* Okla. Stat. tit. 15, § 162 ("A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."). Both parties agree that Arkansas law applies to the issues remaining for determination by the Court. In making their respective arguments, both parties rely extensively on the *Searcy* decision and other Arkansas precedent. (*See* Plfs.' Resp. to Def.'s Mot. for Summ. J. 3-5; Def.'s Reply to Plfs.' Resp. to Def.'s Mot. for Summ. J. 4-10.) The parties have therefore waived any argument that Oklahoma law should apply to the issue presented. *See Mauldin*, 263 F.3d at 1211-12 (noting that parties may waive choice of law arguments by failing to adequately brief them).

### D.    Withdrawal of Stipulations

The parties agreed to stay discovery pending the outcome of Defendant's Motion for Summary Judgment and to submit the summary judgment motion based on stipulated facts, which are set forth in the Joint Status Report ("JSR"). (*See* JSR at 2-3.) These stipulated facts, in addition to a few others, comprise Defendant's Statement of Facts in support of its motion for summary judgment. In their response, Plaintiffs state that stipulating to certain facts, specifically those numbered 7, 8, 9, and 14 in Defendant's Motion for Summary Judgment, was "an absolute and unqualified mistake committed by counsel for O'Neals" and

that such facts are actually disputed by Exhibits 1 and 2 to Plaintiffs' response brief.[4] Defendant argues that Plaintiffs must abide by the stipulations. Defendant further argue that, even considering Plaintiffs' evidence that purportedly disputes previously stipulated facts, there is no genuine issue of material fact that would preclude summary judgment. The Court finds that, even accepting Plaintiffs' evidence that attempts to dispute previously stipulated facts, Plaintiffs cannot survive summary judgment. Accordingly, the Court finds that Defendant will suffer no legal prejudice from the withdrawal, and the Court allows withdrawal of such stipulations. *See In re Durability Inc.*, 212 F.3d 551, 555 (10th Cir. 2000) (stating that "[a]dherence to stipulated facts . . . is not categorical" and that courts "may relieve a party from an improvident [discovery stipulation] or one that might work injustice"; listing relevant considerations as timing of withdrawal and whether legal prejudice will result to opposing party). The Court's allowance of withdrawal comports with "the principle that summary judgment should not be employed to deprive litigants of their right to a full hearing on the merits, if any real issue of fact is tendered." *Id.* (quotation omitted).

**II.     Summary Judgment Standard**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the

---

[4] Facts numbered 7, 8, 9, and 14 in Defendant's Motion for Summary Judgment are identical to stipulated facts numbered 5, 6, 7, and 12 in the JSR.

non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in her complaint but must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

### III. Discussion

As explained above, the parties agree that, in order to qualify for UM coverage by operation of Arkansas law, O'Neal must have been "using" the Insured Vehicle. *See Searcy*, *Searcy,*760 S.W.2d at 864 (holding that Arkansas insurance contracts must extend UM coverage to "users" of insured vehicles when the insurance contract provides liability for that vehicle). In *Searcy*, the Arkansas Supreme Court did not set forth a test for determining whether the insured vehicle is being "used" at the time of the accident. However, the court did hold that the employee, who was standing six to eight feet away and directing the backing of a tractor-trailer rig for his co-driver, was "using" the insured vehicle in that case. *Id.* at 865. The court also cited cases from other jurisdictions discussing whether certain actions were sufficient to be considered use of the insured vehicle. *Id.* at 865-66.

Based on *Searcy* and cases cited therein, the following principles inform whether an insured vehicle is being "used" as that term is defined under Arkansas insurance law. First, an individual can be using the vehicle even if he is outside of the vehicle. *Id.* Second, the connection between the injured individual and the Insured Vehicle cannot have "become too remote" by the time of the accident. *Id.* at 865 (distinguishing cases where "the connection between the person who had dismounted the vehicle had become too remote to constitute 'use' of the insured vehicle"). Third, there must be some causal connection between the accident or injury and use of the insured vehicle. *See Hite v. Hartford Acc. & Indem. Co.*, 344 S.E.2d 173 (S.C. App. 1986) (cited with approval in *Searcy*) ("What appears to be

6

crucial to many courts in determining whether an injury produced by another vehicle or person falls within the ambit of 'use' is the existence of a causal connection between an accident or injury and the use of the vehicle."). Fourth, the injury must "be foreseeably identifiable with normal use, maintenance, and ownership of the vehicle" rather than "caused by some independent or intervening cause wholly disassociated from, independent of or remote from the use of the automobile." *Id.* at 176-77.[5] *Cf. Hisaw v. State Farm Mutual Auto. Ins. Co.*, 122 S.W.3d 1, 3 (Ark. 2003) (considering whether a firefighter's injuries were caused by an accident "arising out of the operation, maintenance, or use" of an underinsured vehicle and concluding that "[t]o prove causation under such circumstances, a plaintiff need only show that the injury originated in, grew out of, or flowed from the use of a vehicle).[6] It is clearly a fact-specific inquiry that turns on the specific circumstances surrounding the accident in question.

---

[5] Defendant argues that an additional principle to glean from *Searcy* is that a person who was a "passenger" of the vehicle prior to the accident cannot be deemed a user. *See Searcy*, 760 S.W.2d at 868 (explaining that prior holding that an insurer could limit UM coverage "to occupants of the vehicle as far as passengers were concerned" was distinguishable because passengers are not expressly protected by the UM statute). The Court does not interpret this language in *Searcy* to mean that a passenger can never be deemed to be using an insured vehicle once he has exited. This seems contrary to the facts of *Searcy*, which involve a "co-driver" of a truck who was directing the driver of the vehicle in backing at the time of the accident. It seems most likely that the injured individual was, immediately prior to the accident, riding as a passenger. In any event, the Court bases its holding on the reasoning below and not on O'Neal's status as a passenger on the way to the job site.

[6] The question presented in *Hisaw* involved determination of whether the accident arose out of use of the *uninsured* vehicle and is therefore slightly distinguishable from the question presented here. Nonetheless, the "originated in, grew out of, or flowed from" requirement is informative.

The following facts, upon which the Court grants summary judgment, are taken solely from evidence submitted by Plaintiffs and are construed in their most favorable light. On the morning of the accident, Chandler drove the Insured Vehicle to the work site and parked it somewhere near them, probably across the street. (Recorded Statement of O'Neal, Ex. 1 to Plfs.' Resp. to Def.'s Mot. for Summ. J., at 5.) Chandler does not remember where he parked the vehicle but stated it would have "more than likely" been on the city street in a "fairly small" area within which they were working. (Recorded Statement of Chandler, Ex. 1 to Plfs.' Resp. to Def.'s Mot. for Summ. J., at 19.) The Insured Vehicle "never strayed too far" from them "because [they] usually get stuff out of it . . . like a metal detector or whatever [they] may need." (O'Neal Statement at 5.) Chandler also does not remember exactly where he parked the Insured Vehicle after returning from lunch at a nearby restaurant, but he believes he would have "parked on the street." (Chandler Statement at 19.) Upon returning from lunch until the time of the accident, which was around 4:30 p.m. or 5:00 pm, Chandler believes they would not have moved far from the Insured Vehicle. At the most, they may have moved "up the street a couple hundred feet." It is even possible, according to Chandler, that they moved the vehicle with them as they did their work. (*Id.*) Accordingly, the Court assumes, for purposes of this motion, that the Insured Vehicle was relatively near O'Neal and was parked on the same street where O'Neal was working when the accident occurred. The Court also assumes, as stated by O'Neal in his Affidavit, that O'Neal and Chandler regularly visited the Insured Vehicle throughout the work day to access equipment, maps, diagrams, and work orders. (*See* O'Neal Aff., Ex. 2 to Plfs.' Resp. to Defs.' Mot. for Summ J., at 2.)

At the time of the accident, Chandler was at a ninety degree angle off the road even with and facing O'Neal, who was on the road and was facing Chandler. (Chandler Statement at 23.) O'Neal had orange safety cones around him to warn oncoming traffic of his presence on the street. O'Neal and Chandler both testified that, at the exact time of the accident, O'Neal was looking through his survey instrument. O'Neal stated:

> Q: Okay. Alright. And you said you were getting ready to leave that day when the accident occurred. Were you starting to pack stuff in your truck or were just trying to finish up what were working on surveying at the time?
> A: Uh, I think we gave one shot - one- maybe two shots - I think. . . . And we was closing up and I'm sure I was looking through my instrument cause I never even saw the lady coming . . . .

(O'Neal Statement at 6.) Chandler stated:

> Q: [T]ell me what you saw and how the accident occurred.
> A: Okay. We were taking some shots in a subdivision. I was giving Cecil a shot. I was facing Cecil. Cecil was facing me. He was looking in through the survey equipment sighting on my range pole and he was taking the shots for the survey . . . .

(Chandler Statement at 23.)

Based on these facts, the Court easily concludes that O'Neal's actions at the time of the accident do not constitute "use" of the Insured Vehicle. First, even assuming the Insured Vehicle was relatively near O'Neal on the street where he was performing his topographical survey, the Insured Vehicle had absolutely no connection or causal relationship to the accident. O'Neal contends that he used the Insured Vehicle as a mobile office and regularly retried items from it. However, it is undisputed that he was not doing so at the time of the accident. Both O'Neal and Chandler recalled that O'Neal was looking through his instrument at the time of the accident. This crucial undisputed fact eliminates the possibility that O'Neal was traversing to or from the Insured Vehicle, was retrieving any equipment from the

Insured Vehicle, or was in any other manner "using" the Insured Vehicle at the time of the accident. This case is therefore distinguishable from *Searcy* and cases cited therein in which the vehicle was somehow being"used" at the time of the accident. *See, e.g., Searcy*, 760 S.W.2d at 864 (employee "using" vehicle because he was directing backing of vehicle while struck); *Oberkramer v. Reliance Ins. Co.*, 650 S.W.2d 300, 302-03 (Mo. Ct. App. 1983) ("[A] police officer's] temporary physical separation from the vehicle did not destroy his "use" of the vehicle, to the contrary it established his actual use of the vehicle for a particular police purpose - a road block."); *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Olson*, 751 P.2d 666, 669 (Hawaii 1988) (employee's lighting of a flare outside of his emergency vehicle "was an activity which was reasonably calculated to safeguard the ambulance and its occupants from a motor vehicle accident" and therefore constituted "use" of the ambulance at the time of the accident).

In an attempt to connect the Insured Vehicle to his accident, O'Neal contends in his Affidavit that "the mere presence of the survey crew truck on the road serves the important function of alerting oncoming traffic to the fact that something out of the ordinary may be going on in the vicinity . . . and . . . the truck has an important safety role to play in the operation." (Ex. 2 at 2.) However, there is nothing in the record indicating that the Insured Vehicle was anything other than an ordinary Ford truck. There is no evidence that it had lights or other signals that were capable of, or were in fact, being employed at the time of the accident to alert oncoming traffic of his presence. Further, it is undisputed that the orange cones were the safety devices being used to block him from oncoming traffic. O'Neal further attempts to connect the Insured Vehicle to the accident by stating that, but for the Insured Vehicle, he would not have been at the job site that day. This is, in the

Court's view, an example of a connection that is simply too remote to be considered use. It certainly does not evidence any type of causal relationship between the injury and use of the Insured Vehicle.

Finally, O'Neal's injury is not of a type that is "foreseeably identifiable" with normal use of the Insured Vehicle. Instead, O'Neal's injury was caused by an intervening factor wholly disassociated from use of the Insured Vehicle. Specifically, the intervening cause was LaPorte's failure to heed orange safety cones, which were present to warn oncoming traffic of O'Neal's presence in the roadway. LaPorte's striking O'Neal with her own vehicle had nothing to do with the presence (or non-presence) of the Insured Vehicle. Instead, this case, which involves an accident occurring while the employee was removed from and performing a task unrelated to the insured vehicle, is more akin to those cited by the Arkansas Supreme Court in *Searcy* in which there was an insufficient connection between the injury and the Insured Vehicle to constitute "use." *See Hite*, 344 S.E.2d at 175-76 (finding no "use" of insured vehicle where an employee of car dealership left the insured vehicle running outside the dealership, approached the dealership, was called over by the night watchman, walked fifty feet to speak to someone sitting in a vehicle, and was then struck by the person sitting in the vehicle); *Anderson v. Ford*, 309 S.E.2d 865 (Ga. Ct. App. 1983) (finding no "use" where employee of law firm parked the insured vehicle, jogged approximately one hundred yards to a public telephone, called his employer, and was struck by driver while in phone booth).[7]

---

[7] Plaintiffs contend there are a "tidal wave" of cases construing the term "use" of a motor vehicle but fail to cite one such case to the Court, let alone a case finding "use" with facts similar to those presented. As argued by Defendant, *Searcy* and the cases cited therein provide sufficient support for a finding that "use" did not occur as a matter of

Defendant's Motion for Summary Judgment (Doc. 16) is hereby GRANTED.

**ORDERED this 14th day of June 2007.**

*/s/ Terence Kern*

**TERENCE KERN
UNITED STATES DISTRICT JUDGE**

---

Arkansas law.